UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-20843-CIV-HURLEY

HENRY GARCIA,
        Petitioner,

vs.

JAMES R. MCDONOUGH, Secretary,
Florida Department of Corrections,
        Respondent.
_____/

## ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Petitioner, Henry Garcia, a Florida death row inmate, has filed a petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254, seeking to challenge his otherwise final convictions and death

sentences for capital murder.

## I. FACTS & PROCEDURAL HISTORY

Garcia was first tried, convicted and sentenced to death for the murders of two elderly sisters

in May, 1988. The relevant facts, as set forth in the Florida Supreme Court's opinion reversing the

original conviction, are set forth as follows:

> On Monday, January 17, 1983, neighbors discovered the bodies of Julia Ballentine, 90, and her sister, Mabel Avery, 86, in the victims' home in Leisure City, Dade County [now Miami-Dade], Florida. A medical examiner testified that both women had been stabbed to death with multiple stab wounds, and Ballentine had been sexually assaulted.
>
> Evidence showed that the victims' home probably had been broken into Saturday night or Sunday morning. The rear patio screen door had been slashed and a jalousie window had been broken. One witness said she heard the glass break at 6 a.m. Sunday. When the bodies were discovered the next day, investigators were unable to find the victims' purses, wallets, or other personal items of identification. Authorities lifted seven latent fingerprints from the house, and they photographed a partial

impression of a footprint made by the heel of a shoe. However, that evidence proved inconclusive or could not be linked to Garcia. Hair samples also had been taken from the bodies and the crime scene. Those samples either were not similar to hair samples taken from Garcia, or the hair comparison analysis proved inconclusive. There was no physical evidence to link Garcia to the crime.

Elizabeth Feliciano and her son, Feliciano Aguayo, testified that at about 7 a.m. Sunday, Garcia showed up at their residence with blood splattered on his shirt, pants, and shoes. The Aguayo home was about one-half mile from the victims' home. Aguayo testified that Garcia told him he had been assaulted by two men and a woman alongside the road as he walked home from a bar where he had been drinking. He said they attacked him with a tire iron, and he defended himself by stabbing them with his knife, after which he fled to an adjacent corn field. Garcia showed Aguayo his pocket knife; it had a bent tip and had blood on it, and the blade was at least four inches long. Aguayo said Garcia kept repeating, "I told them not to make me mad, that I had an animal inside of me." Aguayo said he and others visited the corn field area later that day, but they found no sign of a bloody struggle. The only injury he saw on Garcia was a scratch around his eye.

Rufina Perez testified that she was a migrant farm worker picking crops for Lupe Trevino in January 1983 at the same time Garcia worked there. She said she overheard Garcia say to fellow workers, "I got in a fight, I got in trouble with these ladies ... but I don't have to worry about it because they already in hell." She said Garcia told the others, "I went to the back door, I ripped out the screen door." She said Garcia stopped talking when he realized that she had been listening. She could not identify the men with whom Garcia spoke that day.

*Garcia v State*, 564 So.2d 124 (Fla. 1990).

At the conclusion of the first trial, the jury unanimously recommended two death sentences, which the trial court imposed. On direct appeal, the Florida Supreme Court reversed the convictions on ground that the trial court abused its discretion by excluding certain payroll records which could have been used to impeach Rufina Perez, the witness who claimed to have overheard Garcia making an incriminating statement at his work site. The records showed that Garcia's employment in the fields ended more than a week before the murders, thus making it unlikely that Garcia would have been present or that the alleged conversation took place. *Garcia v State*, 564

So.2d 124 (Fla. 1990).

On remand, Reemberto Diaz, Esq. was appointed to represent Garcia. The case came to trial in May, 1991, and was presided over by Judge Thomas Carney. The trial resulted in Garcia's conviction on two counts of first degree murder and one count of sexual battery. The penalty phase began five days later, resulting in a jury recommendation of death for the murder of the sister who was sexually assaulted, and a recommendation of life imprisonment for the other sister. The trial judge, however, overrode the latter recommendation and imposed a death sentence for each murder. The court found no mitigators and found the following four aggravating factors: (1) capital felony committed by person under a sentence of imprisonment; (2) prior violent felony conviction; (3) capital felony committed while defendant was engaged in sexual battery; and (4) capital felony which was especially heinous, atrocious, or cruel.

Garcia's convictions and sentences were subsequently affirmed on direct appeal by the Florida Supreme Court, which acknowledged that "this case was based substantially on circumstantial evidence," but concluded that "the evidence was inconsistent with any reasonable hypothesis of innocence." *Garcia v State*, 644 So.2d 59, 62 (Fla. 1994), *cert. den.*, 514 U. S. 1085, 115 S. Ct. 1799, 131 L.Ed.2d 726 (1995).

On March 26, 1997, Garcia filed a motion for postconviction relief pursuant to Fla. R. Crim. P. 3.850. After several amendments to the motion were filed, the trial judge ordered a limited evidentiary hearing on the petitioner's claims of ineffective assistance of counsel. These included claims that (1) trial counsel provided ineffective assistance during the guilt phase because he failed to investigate and develop significant impeachment evidence, notably, evidence of a familial relationship between the State's three main witnesses and their motive to lie about

3

obtaining reward monies, and evidence of prior inconsistencies in the witnesses' statements to the police, and (2) trial counsel provided ineffective assistance during the penalty phase because he failed to investigate and present mitigation evidence, including evidence of Garcia's mental health problems and difficulties experienced during childhood and adolescence.

The Honorable Thomas Carney, the same judge who presided over Garcia's 1991 retrial, presided over the postconviction hearing. Kenneth Melnik, Esq. from the Capital Collateral Regional Counsel's South Office represented Garcia. At the beginning of the hearing, Melnik announced that he had just discovered that Garcia's trial counsel, Reemberto Diaz, shared office space with Stuart Adelstein, an attorney and Melnik's second cousin. Melnik indicated that he had discussed this with Garcia, who had no objection to any potential conflict. The court then inquired directly of Garcia, "Does [it] bother you in any way that Mr. Melnik is related to someone who shares space with [Mr. Diaz]?" [App. S. 656]. Garcia responded "No, Sir, it doesn't bother me at all....I'm OK with that. It's just shared space. It wasn't working together." The court accepted this waiver.

Next, defense counsel raised a second and far more significant issue of abandonment or waiver. He announced that the defendant no longer wished to pursue the claims of ineffective assistance of counsel during the *penalty* phase of the trial. The record reflects the following:

MR. MELNIK:     The second matter is Mr. Garcia has gone back and forth with the decision that will affect the presentation of evidence in this case and he would like to address the court.

THE COURT:      Okay.

MR. GARCIA:     I would like to drop or not continue with the penalty phase claims that I have.

4

| | |
|---|---|
| THE COURT: | Well, there is the death sentence case as you probably know. There's the first guilt phase and if you are found guilty, then we enter into what's called the penalty phase, at which time the court will take a recommendation from the jury as to what should be done with you. |
| | Now, I would like to understand you completely as to what you want to do here. I think what you're saying to me is that you're abandoning or giving up your claims as to the punishment phase; is that correct? |
| MR. GARCIA: | That's correct. |
| THE COURT: | Is that what you understand it to be, Mr. Melnik? |
| MR. MELNIK: | Yes. |
| THE COURT: | Ms. Dannelly? |
| MS. DANNELLY: | That's the way I understand it. |
| THE COURT: | Okay. I want to be very careful here. I don't want to create a record that's questionable about what he wants to do. |
| MS. DANNELLY: | We need to delineate those arguments that have been placed his brief to indicate exactly which ones he understand record abandoning in this proceed and which of those as we delineate he wants to proceed with in this hearing. That would be my suggestion. |
| THE COURT: | Sounds sensible. |
| MS. BRILL: | I would like it if you would further colloquy Mr. Garcia to make sure it was a knowing and intelligent waiver of those claims. |
| THE COURT: | Mr. Garcia, as you know, I'm sure somewhere along the lines whether it be this year or next year or whenever, if you don't prevail in this hearing – |
| MR. GARCIA: | Right. |
| THE COURT: | - - You probably will be executed. Do you understand that? |
| MR. GARCIA: | I understand that. |
| THE COURT: | Now, there is nothing wrong with you doing what you're doing. You're free to do what you're doing. I just have to make sure that you fully grasp what it is you're doing. |

5

| | |
|---|---|
| MR. GARCIA: | I understand fully. I'm not attempting to give up my appeal during the hearing. I just want to abandon that part of my appeal. |
| THE COURT: | Okay. That means essentially that if I deny the relief you're seeking in the guilty portion of this situation, then you will be executed; do you understand that? |
| MR. GARCIA: | I do. |
| THE COURT: | I'm not going to ask you the reason why you're abandoning this. I don't think it is my right to do that, but I want to make sure that you are doing it on your own because it makes no difference to me. I want you to know that it makes no difference to me at all, not at all. |
| MR. GARCIA: | I understand that. |
| THE COURT: | And I'm going to do what I think is right whether you agree with it or not because that's my job, that's my function. |
| MR. GARCIA: | I understand. |
| THE COURT: | And you're giving up something that is important and I want you to realize that. I want you to realize that as a result of this, you may very well be executed. |
| MR. GARCIA.: | I realize that already, yes. I know pretty much exactly what I'm doing. |
| MS. BRILL: | I would ask that your Honor ask him whether he has consulted with his attorney about it and if he's satisfied with his representation on that issue alone. |
| THE COURT; | Mr. Melnik has been here on your behalf many times. Have you discussed this issue with him? |
| MR. GARCIA: | We've been back and forth on it a lot of times during the past couple of years. There's been times when I want to go forward and times when I just couldn't stand it, but I told him last week that I wanted to do this. I was sure. |
| THE COURT: | All right. So then, if we could just go through the list of pleadings and determine which issues are still alive and which are not. |

MS. BRILL:          In your order, on the hearing order entitled Order or Request of Evidentiary Hearing signed by your Honor on May 9, 2001, claims which he would be waiving are claim seven, I believe, that the Defendant alleges his right to assistance of competent mental health experts such as a neurologist and toxicologist was denied.

                    Claim that counsel provided ineffective assistance during the penalty phase–

THE COURT;          That would be what number?

MS. BRILL:          Claim nine.

THE COURT:          Nine?

MS. BRILL:          Uh-huh. Part of that specifically that Counsel was ineffective in failing to present evidence of Defendant's mental and physical health by not obtaining the testimony of experts such as a clinical psychologist, neurologist, serologist. Toxicologist. That one claim, you're going to have an evidentiary hearing on.

THE COURT;          What number?

MS BRILL:           That was part of nine, 9-B. 9-C, Counsel was ineffective in failing to present evidence of his childhood upbringing. D, which was that Counsel was ineffective in failing to present evidence that he was a model prisoner. E, that counsel was ineffective in failing to object to victim impact letters. F, counsel was ineffective in failing to appoint defendant counsel before conceding [sic] to merge – Judge some of these claims were summarily denied.

THE COURT;          Okay. Before we get too much into this problem, it would be better if you field a pleading, a pleading indicating which claims are abandoned and then show it to Mr. Melnik and see if Mr. Melnik agrees.

MS. BRILL.;         That will be fine.

MR. MELNIK:         That's fine.

THE COURT:          Okay. All right. Are there any remaining issues then?

MS. BRILL:          I don't know, but did you make a specific finding that the waiver of his claims were knowingly and voluntarily as you would with a plea?

THE COURT:          – with plea?

7

| | |
|---|---|
| MS. BRILL: | Same type of finding, yes. |
| THE COURT; | Sir, anyone forcing you to do this? |
| MR. GARCIA: | No sir.  This is all on my own. |
| THE COURT; | Okay.  No one has influenced you in making this decision? |
| MR. GARCIA: | Nobody. |
| THE COURT: | And is this then still your sole decision? |
| MR. GARCIA: | My sole decision.  Actually, against my Counsel's wishes, yes. |
| THE COURT: | Fine.  The court will find, after that inquiry, that the Defendant has made a free and voluntary waiver of his claims as to the death sentence portion of this 3.850 relief as stated here today. |
| MS. BRILL: | Just so the record is very clear, could you ask Mr. Garcia about whether or not he's taking any type of drugs or are under the influence of any type of alcohol as well as just ask quickly about his educational background, so it's clear he understands and he's an intelligent person and he is competent, you know, those questions. |
| THE COURT; | All right.  While making this decision, Sir, did you ingest any alcohol or psychotropic drugs or anything? |
| MR. GARCIA: | No.  I had a vitamin pill is all. |
| THE COURT: | I didn't hear you. |
| MR. GARCIA: | I had a vitamin pill.  No medications. |
| THE COURT: | Very well.  So what do we got left then? |

[App. S, pp. 656-664].

As a result of the foregoing colloquy, the hearing focused exclusively on petitioner's claims of ineffective assistance of counsel during the *guilt* phase of the trial. The defense called one witness, Reemberto Diaz, defendants' trial attorney. In response to questions, Diaz admitted that in preparing for the retrial, he relied on the investigation done by another attorney in

8

preparation for the first trial and did not take any additional depositions. [App. S pp. 670-71]. When asked if he knew that a familial relationship existed between the three key state witnesses – Rufina Perez, Elizabeth Feliciano and Feliciano Aguayo – Diaz reflected uncertainty, stating he may have been aware of Garcia's relationship to one of them, but was not clear on the nature of the relationship. He offered the opinion that in the Hispanic culture, everyone believes they are related to each other in some tenuous sense, and, therefore, he did not attribute much import to these connections. [App S. 717].[1] He added that he would in any event have "kept away" from the issue of family connections unless he knew of some "beef" that the family members had with each other. [App. S. 716]. Apparently he was unaware that the state witnesses in question were actually related to each other, and not to Garcia.

Diaz further explained he was equally hesitant to explore whether the witnesses may have been motivated by a desire to collect reward monies. He said he was afraid this line of inquiry might hurt the defendant more if it turned out that the witnesses in fact never received the money. He did admit, however, that he was aware that a reward for information about the crimes had been offered prior to the time the witnesses came forward. [App. S. 677] Nonetheless, he apparently did no investigation to verify whether any one of the witnesses might have applied for the money,

---

[1]Diaz testified:

....I guess I can say it because I am Hispanic, you know, but in the context of labor camps, Hispanics generally [believe] everyone is family. I'm even family. I mean family, the definition of family takes a bigger meaning in Hispanics than other people. With Hispanics , it seems that everyone is a distant cousin to somebody's distant cousin and third, fourth, or fifth. But you know, I was raised in this country so I know what values I was raised with. I know what the values of Hispanics are and so I really don't pay too much attention to that because when they tell you, you know, we are somewhat related, usually they are so far distant, that it's meaningless.

App. S. 717.

nor did he solicit any trial testimony as to whether the witnesses ever talked to each other about collecting the money.

Collateral counsel did not question Diaz regarding his failure to investigate the existence of a private agreement or conspiracy between Perez and the Feliciano couple regarding collection of the reward monies. And, while Garcia's Rule 3.850 motion alleged that at least one of the state witnesses, Elizabeth Feliciano, knew that one of the other witnesses, Rufina Perez-Cruz, had lied at trial, collateral counsel did not call Elizabeth Feliciano to testify to illustrate the alleged discrepancies. [2]

Finally, collateral counsel introduced posttrial deposition testimony of Rufina Perez-Cruz, presumably to demonstrate the existence of fertile ground for cross-examination which had been left unexplored by trial counsel.[3] When confronted with inconsistencies with her prior police

---

[2]

In his habeas petition now pending before this Court, Garcia seeks to explore this potential impeachment issue by referencing certain affidavits signed by Elizabeth Feliciano and her husband Jorge Feliciano, in which they both claim that Perez-Cruz agreed to help them bail their son out of jail shortly after the murders only if they would agree to go the police and report they had seen Garcia with blood on him in order to help Perez-Cruz collect the reward money. Both also aver that Rufina went to the police and made up the story about hearing Garcia confess to killing the women in order collect the reward money for herself. However, these affidavits, bearing a signature date of April 21, 2000, were never filed in the state court proceedings and were never introduced or even referenced during the post-conviction hearing on the Rule 3.850 motion. Thus, they will not be considered in this proceeding.

[3]

At trial, Perez-Cruz testified that she and Garcia worked for the same employer in January 1983, and that during the week following the murders, she overheard a conversation between Garcia and some men on the other side of the road, approximately 10-12 feet away. [R. 1024-25]. She claimed to have overheard Garcia say "I got in trouble with these women, but I don't have to worry about it, because they are already in hell." Perez testified that one of the men then asked Garcia "[t]e la shingastes?" which she interpreted as "[d]id you fuck them up?" According to Perez-Cruz, Garcia said "Yes, but I don't have to worry about them, because they are already in hell." R. 1026. She further claimed that she heard Garcia explain how he gained entry into their home, using

statement during her deposition, Perez-Cruz denied that she earlier told the police she overheard

Garcia talking about killing both "guys and old ladies," saying the police report was "all lies." She

also denied ever telling the police that a person by the name of Fernandez was a participant in

Garcia's conversation. On further questioning, she did admit that she had mentioned Enrique

Fernandez in her discussions with a female detective in 1983, but still denied ever stating that

Fernandez was a participant in the conversation with Garcia about the killings.

---

details that matched earlier news reports on the crime: "I went through the back door and I ripped out the screen door." [R. 1027]. She claimed that Garcia then noticed her presence and stopped talking. She admitted that she had heard about the murder on the news before she overheard this conversation between Garcia and the field workers, but denied knowing that a reward had been offered for information about the crimes. Finally, the prosecutor also elicited an affirmation that her testimony in court was the same as that which she told the police when first interviewed in November of 1983. [ R. 1028].

The details which she had earlier provided to the police, however, were in fact at variance with the substance of her trial testimony. During her initial police statement in 1983, Perez said she overheard Garcia talking to some other migrant workers about killing "some guys and old ladies" the night before. She claimed she did not pay much attention to him because she thought he was joking and at that point had not yet heard about the murders of the two elderly women. She made no mention of the "te la chingastes" comment or the entry through a screen door rip. Also, she mentioned to the police that "Kike" or Enrique Fernandez – a separately tried co-defendant–-- was one of the men involved in Garcia's incriminating field conversation.

In her post-conviction deposition, in contrast, Perez revealed that Feliciano Aguayo, the other key witness who reported on Garcia's condition on the morning following the murders, is in fact her brother- in- law, and that she knew his mother, Elizabeth Feliciano, who also testified about the event, as well as Elizabeth's husband, Jorge. She indicated that she never revealed this to anyone involved in the case until the date of her post conviction deposition testimony, and similarly conceded that she never told anyone that she was personal friends with Garcia's co-defendant, Enrique Fernandez, a man she visited in prison, and was a very close friend of his mother. [Depo. 49-50].

In her September 2000 post conviction deposition testimony, Perez identified her signature on a letter to Union Correctional Institution dated Nov. 29, 1988 and a visitation application to UCA dated March 3, 1989 requesting a visit with Enrique Fernandez. [Depos. PCR 722, p. 49-52]. She admitted that she represented herself as Fernandez' aunt and as his girlfriend, and had taken his mother to visit him in jail. She also testified that Fernandez' s mother is a very close friend whom she has known for many years.

At the conclusion of the postconviction hearing, the court denied Garcia's Rule 3.850 motion in its entirety. The court reaffirmed its finding that Garcia had waived his penalty phase claims, and further ruled that Garcia had failed to prove ineffective assistance of counsel during the guilt phase. Addressing trial counsel's failure to impeach Perez with inconsistencies in the police report, the court found no deficiency in counsel's performance, noting that the police report was of questionable impeachment value in the first instance due to numerous errors in its transcription. Garcia appealed to the Florida Supreme Court and raised seven issues pertaining to the deficient performance of trial counsel, the judge and the prosecutor.[4] He also petitioned the Florida Supreme Court for a writ of habeas corpus, raising seven issues pertaining to ineffective performance of his appellate counsel.[5] On the Rule 3.850 appeal, Garcia, attempting to resurrect

_____

[4]The issues raised in the appeal on the Rule 3.850 motion included:
(1) alleged invalidity of Garcia's purported waiver of ineffective assistance/penalty phase claims at evidentiary hearing, due to trial court's failure to direct a proffer of mitigation evidence into record, and its failure to conduct adequate hearing to determine Garcia's capacity to make knowing, intelligent and voluntary waiver of the claim;
(2) alleged violations of due process and equal protection rights due to state agency withholding of certain files and records pertaining to his case;
(3) alleged unreliability of convictions due to cumulative effect of ineffective assistance of trial counsel; withholding of exculpatory or impeachment evidence; newly discovered evidence, and erroneous rulings by trial court;
(4) alleged violation of due process and equal protection rights due to ineffective assistance of counsel by reason during voir dire;
(5) alleged violation of due process rights at trial and during sentencing due to improper prosecutorial argument at guilt/innocence phase and penalty phase and trial counsel's failure to raise proper objection to it;
(6) alleged entitlement to evidentiary hearing on the Rule 3.850 claims that were summarily denied; (7) alleged cumulative error.

[5]The issues raised in the petition for writ of habeas corpus included:
(1) appellate counsel's failure to raise numerous meritorious issues which would have warranted reversal of either the conviction or the sentence of death, or both;
(2) appellate counsel's failure to present complete appellate record and to preserve issues pertaining to the sufficiency of that record;

perceived deficiencies in counsel's performance during the penalty phase, argued *inter alia*, that the trial court did not conduct an adequate hearing to ensure that defendant had that "heightened level of understanding and cognition [needed] to effectively waive counsel or mitigation." citing *Faretta v California*, 422 U.S. 806 (1975). Alternatively, he argued that the trial court erred by accepting the purported waiver of those claims without first requiring a proffer of all available mitigation evidence into the record. [App. K, p. 32]

The Florida Supreme Court considered the postconviction appeal and state habeas proceedings together and ultimately affirmed the trial court's denial of all requested postconviction relief and denied Garcia's request for writ of habeas corpus. *Garcia v State*, 949 So.2d 980 (Fla. 2006).

On the ineffective assistance of counsel/penalty phase claim, the Court did not specifically address the issue pertaining to the adequacy of the hearing on Garcia's abandonment or waiver of his claims involving the penalty phase, but rather focused on only one aspect of the error identified, i.e. whether the trial court erred in not insisting on a proffer of the mitigation evidence before accepting Garcia's waiver of his ineffective assistance claim as it pertained to the failure to introduce evidence in mitigation at the penalty phase. On this distinct issue, the Court contrasted instances

---

(3) appellate counsel's failure to adequately address the "victim impact" testimony of Rose Flight;

(4) appellate counsel's failure to challenge trial court's evidentiary rulings which allowed the state to improperly attack veracity of key defense witnesses;

(5) appellate counsel's failure to challenge denial of right to cross examine state witnesses;

(6) appellate counsel's failure to preserve deficiencies in the sentencing proceeding which violated the Sixth, Eighth and Fourteenth Amendments to U.S. Constitution;

(7) appellate counsel's ineffective presentation of procedural errors and prosecutorial misconduct.

where a defendant waives his right to present mitigation evidence during the penalty phase of *trial,* in which case a proffer is required under state law, *Muhammad v State,* 782 So.2d 343 (Fla. 2001), and situations where a defendant opts to forego presentation of specific mitigation evidence during *post conviction proceedings*, in which case a proffer is not required. *Ferrell v State*, 918 So.2d 163 (Fla. 2005). In the latter situation, it likened a defendant's decision to waive a specific claim to which the mitigation evidence related (e.g. ineffective assistance of counsel/ penalty phase) to a more general waiver of the defendant's state statutory right to collateral counsel in the first instance, finding it sufficient that such waiver simply be "knowing, intelligent, and voluntary." *Id.,* citing *Alston v State*, 894 So.2d 46, 57 (Fla. 2004) and *Durocher v Singletary*, 623 So.2d 482 (Fla. 1993)(assessing waiver of statutory right to collateral counsel in post conviction proceedings).

The Florida Supreme Court found adequate record support to sustain Garcia's waiver of his ineffective assistance/penalty phase claim as valid under this standard, noting that Garcia had signed a sworn affidavit attesting that he had read the entire postconviction motion, and that his "extensive" colloquy with the court indicated that he had discussed the waiver many times with counsel and understood its ramifications. *Id.* at 986. Thus, as previously indicated, the Florida Supreme Court affirmed the denial of Garcia's postconviction attack.

Next, Garcia filed this petition for writ of habeas corpus under 28 U.S.C. § 2254, which authorizes this court to "entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U. S .C .§ 2254(a).

## II. DISCUSSION: FEDERAL HABEAS REVIEW OF STATE COURT JUDGMENTS

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs federal court review of habeas corpus petitions filed after April 24, 1996. *Penry v Johnson*, 532 U.S. 782, 792, 121 S. Ct. 1910, 1918, 150 L.Ed.2d 9 (2001). Since Garcia filed this petition on March 29, 2007, the AEDPA applies to this case.

Congress enacted AEDPA "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases ... and to further the principles of comity, finality, and federalism." *Woodford v Garceau*, 538 U.S. 202, 206, 123 S. Ct. 1398, 155 L.Ed.2d 363 (2003). To these ends, AEDPA "places a new constraint on a federal habeas court's power to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court" by establishing a deferential standard for reviewing state court judgments in these cases. *Williams v Taylor*, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523, 146 L.Ed. 2d 389 (2000).

### A. PROCEDURAL REQUIREMENTS

#### 1. Exhaustion Requirement

Under AEDPA, a federal court may not review a petition for a writ of habeas corpus unless petitioner has first exhausted all state court remedies. 28 U.S.C. § 2254(b)(1); *Lambert v Blackwell*, 134 F.3d 506, 513 (3d Cir. 1998). That is, "[a] state prisoner seeking federal habeas relief cannot raise a federal constitutional claim in federal court unless he first properly raised the issue in the state courts, " *Henderson v Campbell*, 353 F.3d 880, 891 (11th Cir. 2003), citing *Wainwright v Sykes*, 433 U.S. 72 (1977). This exhaustion requirement is predicated on the principle of comity, which ensures that state courts have the first opportunity to review federal constitutional challenges to state convictions, and preserves the role of state courts in protecting federally guaranteed rights. *Williams*

15

*v Taylor,* 529 U.S. 420, 436-37 (2000)('[p]rinciples of exhaustion are premised upon recognition by Congress and the Court  that state judiciaries have the duty and competence to vindicate rights secured by the Constitution in state criminal proceedings"); *Coleman v Thompson*, 501 U.S. 722, 731, 111 S. Ct. 2546, 115 L.Ed.2d 640 (1991).

To satisfy  this requirement, the petitioner must "afford each level of the state courts a fair opportunity to address the claim." *Doctor v Walters*, 96 F.3d 675 (3d Cir. 1996).  To "fairly present" a claim, a habeas petitioner "must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." *Anderson v Harless*, 459 U.S. 4, 6, 103 S. Ct. 276, 74 L.Ed.2d 3 (1982).  In other words, the petitioner must present the claim to the state courts in terms of the denial of a federal right. *Duncan v Henry*, 513 U.S. 364, 365-66, 115 S. Ct. 887, 130 L.Ed.2d 865  (1995) (per curiam).

The state court need not discuss or base its  decision upon the presented claims for those claims to be considered exhausted, however.  It is only essential that the petitioner presented those claims and gave  the state courts an opportunity to rule on them. *Doctor v Walters,* 96 F.3d 675, 678 (3d Cir 1996).

### 2. Procedurally Defaulted Claims

"The teeth of the exhaustion requirement  comes from its handmaiden, the procedural default doctrine." *Smith v Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001), *cert. den.*, 534 U.S. 1136 (2002), which was developed as a means of ensuring that federal habeas petitioners first seek relief in accordance with established state procedures. *Henderson v Campbell,* 355 F.3d 880, 891 (11th Cir. 2003). Under the procedural default doctrine, "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief,

unless either the 'cause and prejudice' or the 'fundamental miscarriage of justice' exception is applicable." *Smith*, 256 F.3d at 1138; *Henderson*, 353 F.3d at 892.

Under the first exception, a petitioner may obtain federal review of a procedurally defaulted claim if he can show both "cause" for the default and actual "prejudice" resulting from the default. *Henderson*, 353 F.3d at 892, citing *Murray v Carrier*, 477 U.S. 478, 485 (1986). To establish "cause" for a procedural default, "a petitioner must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in the state court." *Id.*, citing *Wright v Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). To establish "prejudice," a petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different but for the interference. *Id.,* citing *Crawford v Head*, 311 F.3d 1288 (11th Cir. 2002).

Alternatively, a federal court may grant a habeas petition on a procedurally defaulted claim, without a showing of cause or prejudice, where necessary to correct a fundamental miscarriage of justice. *Id.,* citing *Murray*, 477 U.S. at 495-496. A "fundamental miscarriage of justice" involves the extraordinary case where a constitutional violation has resulted in the conviction of someone who is actually innocent. *Id.*

## B. STANDARD OF REVIEW

Once a federal habeas court determines that a petitioner has exhausted state remedies, or that a merits review is warranted despite a procedural default, the court must determine what standard governs the review of each claim.

If a state court has adjudicated the merits of a claim, a federal habeas court's standard of review is constrained by § 2254(d), which provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

### 1. Conclusions of Law

The two conditions set forth in §2254(d)(1) – the "contrary to" and "unreasonable application" clauses - present "independent statutory modes of analysis." *Alderman v Terry*, 468 F.3d 775, 791 (11th Cir. 2006), citing *Williams v Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 1519-20, 146 L.Ed.2d 389 (2000). A state court decision is "contrary to" Supreme Court precedent under § 2254(d)(1) if it "applies a rule that contradicts the governing law set forth [by the Supreme Court]." *Williams*, 529 U.S. at 405, 120 S. Ct. at 1519 (O'Connor, J., for the majority). In other words, a state court's decision is "contrary to" federal law if the decision applies a legal principle "substantially different from the relevant precedent of [the Supreme Court.]." *Id.* [6]

Where the state court correctly identifies the governing precedent, that court's decision cannot be said to be "contrary to" federal law. *Id* at 406, 120 S. Ct. at 1520. However, identification of the correct legal standard does not wholly insulate a state court decision from

---

[6] For example, the "contrary to" standard is satisfied where the state court applies a rule that contradicts the governing law, or where the state court is confronted by a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result. *Id.* at 405-06, 120 S. Ct. at 1519-20.

habeas review.   In such cases, the federal court next applies §2254(d)(1)'s second clause and the inquiry turns to "whether the state court's application of clearly established law was objectively unreasonable." *Id.* at 409, 120 S. Ct. at 1495.

A decision is  "objectively unreasonable" under this  standard if the state court either unreasonably extends a legal principle from the Supreme Court's precedent to a new context where it should not apply,  or unreasonably refuses to extend that principle to a new context where it should apply. *Id.* at 407;  *Dingle v Secretary for Department of Correction*, 480 F.3d 1092, 1098 (11th Cir. 2007), citing  *Williams,* 529 U.S. at 407, 120 S. Ct. at 1520.

The "established federal law" which a federal court must look to in conducting both the "contrary to" and "unreasonable application" analysis is  not  embodied  in  the  decisions of  the lower federal courts. *Maharaj v Secretary for Dept. of  Correction*, 432 F.3d 1292, 1308 (11th Cir. 2005).  Rather, § 2254(d)(1) expressly establishes Supreme Court precedent as the touchstone of "clearly established federal law." § 2254(d)(1).  Thus, the court in this case  is constrained to compare the state court result with the holdings – not the dicta – of Supreme Court decisions extant at the time the Florida  Supreme Court issued its opinion in *Garcia III.  See Williams*, 529 U.S. at 412, 120 S. Ct. at 1523.

## 2. Findings of Fact

As to  findings of  fact,  federal court  review  of  a state court judgment is constrained by 28 U. S.C. § 2254(d)(2).  Under  this standard, a  federal  court  may  not  issue a  writ unless the state court's adjudication of the claim  "resulted in a decision that was based on an  unreasonable determination of  the facts in light of the evidence presented  in the State court proceeding." 28 U.S.C. § 2254(d)(2).  In  making  this  assessment, a  federal habeas court must presume that a

state court's findings of fact are correct, 28 U. S. C. § 2254(e)(1),[7] and the petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C § 2254(e)(1).   This is a high bar, but does not foreclose federal intervention in the appropriate case. *See Miller-El v Dretke,* 545 U.S. 231, 240, 125 S. Ct. 2317, 2325, 162 L.Ed.2d 196 (2005)("The standard is demanding but not insatiable ...[d]eference does not by definition preclude relief.'"), quoting *Miller-El v Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L.Ed. 2d 931 (2003); *Wiggins v Smith*, 539 U.S. 510, 527-28, 123 S. Ct. 2527, 2538-39, 156 L.Ed.2d 471 (2003)(holding a state court's factual determinations unreasonable).

With this predicate, the court now turns to the merits of Garcia's claims.  Each claim is considered consecutively here in the order presented in the petition, with the exception of the ineffective assistance of counsel/penalty phase claim, subsumed within Claim 4, which the court considers out-of-turn at the outset of its analysis.

### III. DISCUSSION: CLAIMS ANALYSIS

#### A. Ineffective Assistance of Counsel/ Penalty Phase
#### (Petitioner's Claim 4)

In Claim 4 of his petition, Garcia argues, *inter alia*, that his trial counsel was ineffective for failing to investigate and present mitigation evidence during the *penalty* phase of his trial.  Further, he contends that the Florida Supreme Court  erred in affirming the state postconviction court's acceptance of his abandonment and waiver of this claim following his withdrawal of it at the outset

---

[7]28 U.S.C. §2254(e)(1) provides:
In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

of the evidentiary hearing on the Rule 3.850 motion.   The respondent, in opposition, asserts that the portion of the claim regarding ineffective assistance of counsel is unexhausted, procedurally barred and without merit.

By initially raising an ineffective assistance of counsel/penalty phase claim in his Rule 3.850 motion but later dismissing the claim prior to the state court's adjudication of it on the merits, petitioner failed to properly exhaust this claim in state court.   Consequently, he is barred by firmly established and consistently applied state procedural rules from raising it now,[8] and has procedurally defaulted on the claim for federal habeas purposes.   This court's review is accordingly precluded by this adequate and independent state procedural ground unless Garcia can show both "cause" for the default and actual "prejudice" resulting from it. *See Henderson v Campbell*, 353 F.3d 880 (11th Cir. 2003), *citing Murray v Carrier*, 477 U.S. 478 (1986); *Wainwright v Sykes*, 433 U.S. 72, 87 (1977).

To establish "cause" for a procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court. *Henderson*, citing *Wright v Hopper*, 169 F.3d 696 (11th Cir. 1999).  Such objective factors may include interference by government officials which made compliance impracticable, attorney error rising to the level of ineffective assistance of counsel, or a showing that a factual or legal basis

---

[8]

If he filed a Rule 3.850 petition now, asserting the same claim he initially raised in the Rule 3.850 petition but then dismissed, the new motion would be barred by multiple procedural rules, including the rule against successive petitions and the statute of limitations. See Fla. R. Crim P. 3.850(f). *See e.g. Baker v State*, 878 So.2d 1236 (Fla. 2004); *Herns v State*, 868 So.2d 589 (Fla. 3d DCA 2004)(second or successive motion for post conviction relief can be denied on ground that it is abuse of process if there is no reason for failing to raise the issue in initial motion); *Spicer v State*, 898 So.2d 984 (Fla. 5th DCA 2005).

for a claim was not reasonably available. *Murray v Carrier*, 477 U.S. 478, 488 (1986); *McCleskey v Zant*, 499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed.2d 517 (1991); *Hargrave-Thomas v Yukins*, 374 F.3d 383 (6th Cir. 2004); *Moore v Casperson*, 345 F.3d 474 (7th Cir. 2003).

To show "prejudice," which excuses procedural default, a petitioner in turn must show that there is at least a reasonable probability that the result of the proceeding would have been different but for the interference. *Id.,* citing *Crawford v Head*, 311 F.3d 1288, 1327-28 (11th Cir. 2002). [9]

Thus, the threshold issue presented on the ineffective assistance/penalty phase prong of Claim 4 is whether petitioner has established sufficient "cause" to overcome his apparent procedural default on this claim. In his presentation of this claim, Garcia argues that because of the deficiency of the state court's inquiry into his mental status, the state court lacked a constitutionally effective basis on which to conclude that his dismissal of his ineffective assistance claim was "knowing, voluntary and intelligent." [Petition, ¶233]. Without invoking the precise nomenclature of the "cause" and "prejudice" exception which attends the procedural default doctrine, Garcia effectively seeks to cast this alleged lapse on the part of the state court as a sufficient and effective cause which might excuse his procedural default on the claim for federal habeas purposes.

With this backdrop, the court first reviews the requirements for assessing the competency of a death row prisoner who expresses a desire to forego or waive his claims on postconviction review, recognizing the AEDPA- mandated deference owed to any prior determination of the Florida

---

[9]

Alternatively, a federal court may grant a habeas petition on a procedurally defaulted claim, without a showing of cause or prejudice, to correct a fundamental miscarriage of justice. *Id.,* citing *Murray*, 477 U.S. at 495-96, 106 S. Ct. At 2678. A "fundamental miscarriage of justice" occurs in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent. *Id.* Garcia does not raise a claim of actual innocence in his petition before this court, and hence, the court's analysis focuses solely on the "cause" and "prejudice" exception.

Supreme Court on this issue.[10]

The analysis on the waiver issue appropriately begins with examination of the Supreme Court's opinion in *Rees v Peyton*, 384 U.S. 312, 86 S. Ct. 1505, 16 L.Ed. 2d 583 (1966), which is "consistently cited as setting forth the controlling legal standard for assessing the validity of a death row inmate's choice to forego postconviction review." *Henderson v Campbell*, 353 F.3d 880, 893 (11th Cir. 2003). In *Rees*, the petitioner directed his counsel to withdraw his petition for certiorari and forego any further attacks on his conviction and death sentence. Defense counsel advised the Court that he could not conscientiously accede to his client's instructions without a psychiatric evaluation because evidence cast doubt on Rees' mental competency. Additionally, a psychiatrist filed a detailed report concluding that Rees was mentally incompetent.

Against this background, the Supreme Court remanded the case to the district court to make a determination as to Rees' mental competence, noting that it would be appropriate to subject him to psychiatric and other medical examinations. *Id.* at 314, 86 S. Ct. 1505. The Supreme Court instructed the district court to "hold such hearing as it deems suitable, allowing the State and all other interested parties to participate should they so desire[.]" *Id.* The question it framed for the district court on remand was whether Rees "has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in

---

[10]

*See Demosthenes v Baal,* 495 U.S. 731, 737, 110 S. Ct. 2223, 109 L.Ed.2d 762 (1990)(state court finding of competence to waive further appeals was entitled to presumption of correctness under pre-AEDPA§2254); *Lonchar v Zant*, 978 F.2d 637 (11th Cir. 1992)(whether convict is competent to forego collateral review of his conviction is factual question on which district court finding is subject to clearly erroneous standard of review).

the premises." *Id.* at 314. Thus, the Supreme Court mandated an on-the-record assessment of the defendant's mental capacity to make a valid and knowing waiver of his right to pursue postconviction relief.

Nothing in *Rees* suggests that the Supreme Court was abandoning the tenet that a litigant is presumed to be competent.    Rees is an example that when a court has reason to doubt a defendant's competency, it is obligated to take appropriate steps to assure itself of the defendant's competency. By directing the trial court on remand to hold "such hearing as it deems suitable," *id.* at 2214, *Rees* teaches that the trial court is necessarily vested with some measure of discretion in determining the type and extent of procedures necessary to decide the issue of competency in this specific post-trial setting.    *Rees* also informs that some "psychiatric and other medical examination" may be included in that decision making process, *see Mata v Johnson,* 210 F.3d 324, 327-28 (5th Cir. 2000), with the breadth and depth of inquiry appropriately influenced by the extent and severity of the history of mental health problems which have been brought to the court's attention. *See Drope v Missouri,* 420 U.S. 162, 95 S. Ct. 896, 43 L.Ed.2d 103 (1975). A hearing is required if a reasonable jurist would have a *bona fide* doubt as to the defendant's competence under the circumstances. *See e.g.  St. Pierre v Cowan*, 217 F.3d 939 (7th Cir. 2000); *Mata v. Johnson,* 210 F.3d 324 (5th Cir. 2000). *See also  Battle v U. S.*, 419 F.3d 1292 (11th Cir. 2005); *Yarton v U.S.,*  87 F.3d 1326 (9th Cir. 1995).

Since *Rees,* the United States Supreme Court has held that a state court's conclusion regarding a defendant's competency to abandon collateral review of a murder conviction and death sentence is a factual issue entitled to a presumption of correctness on federal habeas review. As such, it cannot be overturned unless the court finds it is not "fairly supported by the record."

*Demonsthenes v Baal*, 110 S. Ct. 2223, 495 U.S. 731, 109 L.Ed.2d 762 (1990). Applying this deferential approach in *Demonsthenes*, the Supreme Court upheld the federal district court's reliance on a state court's factual finding of competency to waive the right to seek postconviction relief, noting that the finding was supported by the testimony of three psychiatrists who examined the defendant. *Id.*

Following *Rees* and *Demonsthenes,* the Eleventh Circuit has consistently shown great deference to state court findings of competency to waive collateral attack, whether that finding is made at a postconviction evidentiary hearing held for the specific purpose of determining the defendant's competency to abandon collateral review of his conviction and sentence, *see e.g. Lonchar v Zant*, 978 F.2d 637 (11th Cir. 1992) (mental examination ordered by state trial court in connection with postconviction evidentiary hearing on defendant's competency to waive state habeas review), or whether the finding is drawn from evidence taken at an earlier stage of the state trial court proceeding. *See e.g. Hauser ex rel. Crawford v Moore*, 223 F.3d 1316 (11th Cir. 2000)(competency to waive federal habeas review supported by state trial court's earlier determination of competency to proceed *pro se* following *Faretta* hearing and submission of related expert testimony).

Under the standard announced in *Rees,* federal due process requirements dictate that the postconviction court first determine the threshold question of defendant's competence to withdraw his collateral challenge, and next determine the distinct question of whether the purported waiver is voluntary, knowing and intelligent. These two questions – the competency to waive the right in the first instance and the quality of the waiver in the second (i.e. the attendance of the knowing, intelligent and voluntary elements ) are distinct.

As the United States Supreme Court articulated  in *Godinez v Moran*, 509 U.S. 389, 401 n. 12, 113 S. Ct. 2680, 125 L Ed.2d 321 (1993):

> The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the ability to understand the proceedings.  The purpose of the "knowing and voluntary" inquiry, by contrast, is to determine whether the defendant actually does understand the significance and consequences of a particular decision and whether the decision is uncoerced.

*See also Comer v Stewart*,  215  F.3d 910 (9th Cir. 2000)(district court must determine petitioner's competence to withdraw appeal as well as separate question of  whether petitioner's  decision is voluntary).

In  this case, Garcia gave all outward  appearances of  mental  competence during his two trials and the  postconviction hearing on his  Rule 3.850 motion.  It is noteworthy that the judge who presided at the postconviction hearing also presided at petitioner's retrial and  thus had ample time to observe the defendant.  Furthermore, during the postconviction  hearing, Garcia appeared to be fully able  to communicate in an intelligent and coherent manner. He appeared to understand and answer questions posed by the trial court  pertaining to his decision to waive the ineffective assistance/penalty phase claim.     In addition,  Garcia claimed,  under  oath, to have read  his amended consolidated Rule 3.850 motion, which contained a  fifteen page  section devoted to the ineffective assistance/penalty phase claim.      This included  a detailed history of an impoverished childhood  marred by severe  physical and  psychological abuse,  followed by  six years of adolescent  institutionalization  and nearly lifelong adult imprisonment,

all compounded by a history of alcohol and chemical addiction.[11]   Collateral counsel did not

mention any of this information to the trial court before announcing  the dismissal of the ineffective

---

[11]

The motion before the trial court recites that Garcia was born to a twelve-year old mother and left to rear by his grandmother and live-in uncle. He worked as a migrant farm worker chopping cotton from the age of five and was exposed on a long term basis to damaging pesticides, including DDT, known to cause  long term or permanent neurological disorders and psychological disturbances. He was beaten by his grandmother and uncle Tony, who sexually molested his sister from the time she was four years old until she was fifteen and left home. Garcia began sniffing glue and lighter flood as young as eleven years old, when he moved to Lleveland Texas to chop cotton with his Uncle Tony.

At the age of twelve, Garcia ran away to find his biological father in Ropesville, Texas. At the age of thirteen, he was sent to Gatesville State School for boys, under the jurisdiction of the Texas Youth Commission. (TYC)   He remained under care of the TYC until he was nineteen, spending the last three years of that term at Mountain View Reformatory State School for Boys. Less than two years after he left Mountain View, the facility was closed under federal court order for conditions deemed violative of Eighth Amendment prohibition against cruel and unusual punishment. *Morales v Turman*, 383 F. Supp. 53 (1974). *See Weeping in the Playtime of Others: America's Incarcerated Children,* McGraw Hill Book Co., p. 5 (1976)

Judge William Wayne Justice, the federal district judge who closed the  facility after personally touring it, recounted stories from boys who had been tear gassed in their cells, chained together and forced to march across a field picking at the earth in meaningless exercise, beaten, tortured and raped . The routine slapping, beating and physical abuse inflicted by the staff included "peels"-- forcing boys to bend over without shirt and be struck on back by fist of staff member; "tights"-- forcing boys to bend down holding both ankles, then eaten in buttocks with handle or straw end of broom mop or stick;  "brogeuing"-- kicking boys in the shins until they fell down, and "racking" - -requiring boys to put hands in their pockets and then line up against a wall to be kicked in the  teeth, punched and beaten. *Morales, supra* at 80.   Extortion, assault, rape and extreme physical and mental abuse were daily norms. *Id* at 122.   The Angola prison in Louisiana was once deemed the United  States' worst prison until Department of Justice experts branded the TYC facilities even more deplorable. *Morales* at 122.

Garcia  suffered  severe and daily "rackings" from officers, particularly during his  early years. He was hit with wood paddles, large sticks  combat boots and fists, and often kicked in teeth, punched in face, beaten, tortured and deprived of sleep.  He was sent to the "hole" more than ten times during his three years, typically spending between 20 to 30 days in solitary.

At nineteen, two weeks after his  release in December 1967, Garcia started drinking and was arrested for stealing $5. He was thereafter incarcerated for all but five or six months of the next sixteen years, until 1983, the year of the crimes for which he was sentenced to death. Amendment to Consolidated Amended Motion to Vacate Judgments of Conviction and Sentence [R. 834- 848].

assistance/penalty phase portion of Garcia's claims, however, nor did he express to the court any

concerns or reservations he might have had about Garcia's mental competency.  Further, although

Garcia's collateral counsel by that juncture had generated substantial postconviction deposition

testimony and reports from multiple mental health professionals who examined Garcia and agreed

on a diagnosis of organic brain damage, likely secondary to severe physical abuse sustained as

teenager and a long history of drug and chemical abuse, [12] it does not appear that counsel actually

---

[12]

Garcia was interviewed and evaluated during the course of postconviction proceedings by Dr. Thomas Hyde, neurologist, Dr. David Schretlen, neuropsychologist, and Dr. Dr. Faye Sultan, psychologist. On December 20, 2004, he supplemented the record with depositions and expert reports from these medical experts, including the report of David Schretlen, Phd, who had prepared an eight page report on August 1, 2001 which the State submitted as an exhibit at his deposition. [R. 929-30].

Dr. Thomas Hyde, a behavioral neurologist who took Garcia's history and performed a neurological exam, found specific abnormalities indicative of frontal lobe dysfunction during mental status testing and motor evaluation. [Supp PCR 1083, 1086, 1092-94] In this specific respect, Dr. Hyde testified as follows:

> I think that Mr. Garcia has evidence of [impairment] on the basis of his attentional problems, his complex motor sequencing deficits and his two frontal release signs of a frontal lobe impairment ....[W]ithin a reasonable degree of medical certainty that frontal lobe dysfunction predated his incarceration and ...was present at the time of the alleged murders or his alleged involvement in these murders; that frontal lobe dysfunction while not incapacitating to him would have a profound effect on his behavior in rendering him prone to poor judgment, impulsive behavior, poor reasoning of the consequences of his action, and a poor dampening of his emotional response to any type of provocation, even trivial provocation, so I would think it would have a marked effect on his behavior through out his life.

> And as far as the etiology of this frontal lobe dysfunction... I think there are several factors at work. Number one, closed head injuries, being beaten, particularly at the Mountain View School; number two, and probably more importantly, extensive substance abuse, particularly as a child and adolescent with organic inhalants which are well known to be toxic, particularly for cortical dysfunction and possibly the pesticide and chemical exposure, when working as a migrant laborer although medial literature is less emphatic about that than it is about the toxic effects of inhalants.

filed these materials with the court prior to the trial judge's disposition of Garcia's Rule 3.850 motion. [13]

Without the timely presentation or filing of this medical evidence bearing on Garcia's mental competency, without an advocate for incompetency, and without any other history of irrational behavior or bizarre courtroom demeanor on the part of Garcia, the state court's failure to conduct further inquiry into Garcia's cognitive abilities prior to accepting his waiver on the ineffective assistance of counsel/penalty phase claim cannot reasonably be viewed as "contrary to, or involv[ing] an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States." §2254(d)(1). Nor is this court able to conclude that the state court's determination resulted "in a decision that was based on an unreasonable determination of the facts in light of the evidence presented." § 2254(d)(2).

Instead, the lengthy colloquy between the court and petitioner makes clear that Garcia understood the "bottom line" of his legal situation, that he had to continue to engage in collateral review of counsel's performance at the penalty phase or be executed, and that he was able to make a rational choice among these options. The colloquy also makes clear that he was coherent and responsive to the court's questioning, and that he had a basic understanding of the purpose of the Rule 3.850 proceedings which he was deciding to abort, namely, an effort to avoid the death penalty and get a new sentencing.

---

[13]

The record reflects a "notice of filing" of the deposition of Dr. Schretlen (taken 8-14-01); Dr. Thomas Hyde (8-14-01) and Dr. Faye Ellen Sultan (11-14-02) certifying a file date of December 20, 2004 – over a year after the November 17, 2003 evidentiary hearing on the Rule 3.850 motion.

The Florida Supreme Court reviewed this colloquy before reaching its decision in *Garcia III,* finding it adequate to demonstrate that Garcia acted voluntarily, intelligently and knowingly in making this waiver. Although it did not expressly address the issue of Garcia's mental competence to make the decision in the first instance, such a finding is necessarily implicit in its ruling on the intelligent and knowing aspects of the waiver.

Thus, the trial court's acceptance of Garcia's waiver on the ineffective assistance of counsel/penalty phase claim -- and the Florida Supreme Court's affirmation of the validity of that waiver – cannot reasonably be viewed as an illegitimate interference or "objective factor external to the defense" which might serve as legal "cause" excusing Garcia's procedural default on this claim. As a result, Garcia's ineffective assistance of counsel/penalty phase claim is procedurally defaulted without excuse, and is not now properly before this court for review. *See Henderson v Campbell,* 353 F.3d 880 (11th Cir. 2003)(rejecting "lack of understanding" argument as cause to excuse procedural default and upholding validity of petitioner's choice to waive state post conviction review as knowing and intelligent).

## B. Deprivation of a Fair Trial Due To Prosecutorial Misconduct, Ineffective Assistance of Counsel and Judicial Error in Voir Dire (Petitioner's Claim 1)

In challenging his underlying convictions, Garcia asserts he was denied a fair trial due to various errors occurring during the voir dire of his retrial, including instances of prosecutorial misconduct, judicial error and ineffective assistance of counsel. He also complains that the Florida Bar ethical rule prohibiting juror interview is unconstitutional and that he was denied a fair trial due to pretrial publicity. The Respondent asserts that parts of this claim are unexhausted, parts are procedurally barred, and all are without merit.

30

### 1. Prosecutorial Misconduct - Voir Dire

As to the threshold claim of prosecutorial misconduct, Respondent contends that this aspect of the claim is procedurally defaulted because petitioner did not comply with the State's contemporaneous objection rule. In viewing the issue on direct appeal, the Florida Supreme Court determined that petitioner failed to object to most of the matters at issue and that he had not demonstrated plain error affecting his substantial rights. *See Garcia II*, 644 So.2d at 62-63.

For the doctrine of procedural default to apply to this claim, a firmly established state procedural rule applicable to the claim must exist, and the petitioner must have failed to comply with that rule. Additionally, the last state court from which the petitioner sought review must have invoked the state procedural rule as a basis for its decision to reject review of the petitioner's federal claim. *Coleman v Thompson*, 501 U.S. 722, 750, 111 S. Ct. 2546, 115 L.Ed.2d 640 (1991). Here, the Florida Supreme Court rendered the last reasoned opinion discussing prosecutorial misconduct and relied upon a state procedural bar to deny relief on this claim. The procedural rule in question is the requirement that a criminal defendant make contemporaneous objection to prosecutorial misconduct in order to preserve such a claim for appellate review.

The contemporaneous objection rule was firmly established and regularly followed with respect to this ground before Garcia's 1991 retrial. Therefore, the Florida Supreme Court's reliance on the petitioner's failure to object to the prosecutor's conduct during voir dire is an adequate and independent state ground for foreclosing habeas review on the point in this court. *Engle v Isaac*, 456 U.S. 107, 102 S. Ct. 1558, 71 L.Ed.2d 783 (1982) (petitioner who fails to comply with state rule mandating contemporaneous objections to jury instructions may not challenge the constitutionality of those instructions in a federal habeas corpus proceeding).

## 2. Trial Court Errors

The petitioner also contends that he was deprived of a fair trial by reason of the trial court's failure to excuse for cause a juror whose brother had recently been murdered (Juror Hepburn) and in excusing for cause prior to the penalty phase a juror who expressed an inability to impose the death penalty "in any case." (Juror Cruz Pino). These claims were summarily rejected by the Florida Supreme Court. Upon review, this Court does not find the state court's denial of this aspect of the claim to be an unreasonable application of clearly established United States Supreme Court precedent.

In *Wainwright v. Witt*, 469 U.S. 412, 105 S. Ct. 844, 83 L.Ed.2d 841 (1985), the United States Supreme Court held that the standard for determining whether a venire member's views about the death penalty create impermissible bias hinges on "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Id* at 424.Moreover, a state court's decision that a juror is excusable for cause under this standard operates as a finding of fact entitled to a presumption of correctness. *Witt* at 429.

The state trial court found Juror Cruz-Pino unequivocal in his expressed inability to follow the law. The fact that this juror's answers might be susceptible to different interpretations does not overcome the presumption of correctness which attaches to the trial court's fact finding in this regard. In elaborating on his initially expressed inability to impose the death penalty "in this case," Juror Cruz- Pino explained he "meant to say ... I couldn't impose the death penalty in any case," and he persisted in asserting that he would never vote for death throughout the questioning.

Under these circumstances, petitioner has not met his burden of showing that the trial court's finding of bias which precipitated the excusal of Juror Cruz-Pino was incorrect or unreasonable by clear and convincing evidence. Accordingly, the Florida Supreme Court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established governing United States Supreme Court precedent, precluding any federal habeas relief upon this claim.

Similarly, petitioner has not shown by "clear and convincing" evidence that the trial court's retention of Juror Hepburn was incorrect or unreasonable under the *Witt* standard. *Gilliam v. Sec'y for the Dept. of Corrections*, 480 F.3d 1027, 1032 (11th Cir. 2007)(given presumption of correctness that attaches to fact finding of state court under AEDPA, petitioner has burden of demonstrating error by clear and convincing evidence). Accordingly, Garcia is entitled to no federal habeas relief on this claim.

### 3. Ineffective Assistance of Counsel/Guilt Phase; Unconstitutional Prohibition Against Post-Verdict Communications with Jurors; Deprivation of Fair Trial Due to Pretrial Publicity

In the balance of Claim 1, petitioner weaves together three other challenges to his underlying convictions. First, he contends that he is entitled to habeas relief because trial counsel was ineffective during the voir dire phase based on his failure to question the jury about their death penalty views; failure to rehabilitate venire members who expressed some doubt on their ability to impose the death penalty, failure to challenge a juror whose brother was recently the victim of an unsolved murder under investigation by same police department, and failure to question the venire about exposure to pretrial publicity and to move for a change of venue. Second, he contends that the Florida Bar ethical rule which prohibits attorneys from contacting jurors is unconstitutional and unfairly prevented him from investigating whether he might have grounds to challenge his

33

convictions or sentences.   Third,   Garcia claims that he was deprived of a fair trial due to inflammatory pretrial publicity, and that his attorney was ineffective  for failure to move for a change of venue based on such publicity.

In his motion for postconviction relief before the trial court, petitioner asserted each of these same claims, but the court denied them summarily.  It found  the claim that counsel was ineffective for the manner in which  voir dire was conducted to be  insufficiently  pled.  It found  the claim regarding the Florida Bar  ethical rule to be  procedurally barred and without merit, and it deemed the claim regarding pretrial publicity  as a claim of ineffective assistance based on failure  to move for a change of venue and, as such, found the claim  insufficient.

On  appeal  to  the  Florida  Supreme  Court,  Garcia  renewed  his  argument  regarding ineffectiveness of trial counsel due to  failure to question the venire about their  death penalty views and pretrial publicity, failure to move for a change of venue, and failure  to excuse Juror Hepburn for cause.   However, he did not mention the denial of his previously lodged claim that counsel was ineffective for  failure to attempt  rehabilitation of  venire members, and did not mention the claim that the ethical rule prohibiting juror contact was unconstitutional.   Because he did not raise these particular  claims through all available state appeal processes, they are unexhausted  for purposes of federal habeas review and are not now a proper subject of review by this court.   *O'Sullivan v Boerckel,* 526 U.S. 838 (1999).

As to the alleged deficiencies in trial counsel's performance during voir dire, applying *Strickland,* the Florida Supreme Court concluded  that petitioner failed to establish  that trial counsel was  ineffective because  his allegations are conclusively refuted by the record.   It also found insufficient allegations of prejudice resulting  from trial counsel's deficiency, if  any, during the

questioning of potential jurors about their death penalty views during voir dire. *Garcia III*, 949 So.2d at 987, 990. The Florida Supreme Court's decision on this point constitutes a reasonable application of *Strickland*, and accordingly, Garcia is not entitled to federal habeas relief on this aspect of the claim. *Baldwin v Johnson*, 152 F.3d 1304 (11th Cir. 1998)(denying a claim because a defendant does not allege how the alleged deficiency created a reasonable probability of a different result in more than conclusory terms is consistent with *Strickland*).

As to the alleged improper comments by the prosecution during voir dire, including the reference to an "imaginary cloak of innocence" covering the defendant, a comment concerning the State having the only responsibility in the case, and a misstatement of the definition of reasonable doubt, petitioner did raise these claims on direct appeal to Florida Supreme Court, but did not cite to a constitutional provision or federal law and did not label the claims federal. By failing to do so, he failed to "fairly present" his constitutional claim to the Florida Supreme Court, rendering this aspect of the claim unexhausted for federal habeas purposes. *Baldwin v Reese*, 541 U.S. 27, 124 S. Ct. 1347, 158 L.Ed.2d 64 (2004). However, even if this claim had been fairly presented to the state court, it would still be procedurally barred because petitioner failed to make a contemporaneous objection to the bulk of the alleged improper commentary by the prosecutor. This lapse prevented the Florida Supreme Court from exercising review of the challenge, leaving the claim unexhausted and procedurally barred for federal habeas purposes.